John P. Cohalan, Jr., J.
In this rather unusual case, which was tried before the court without a jury, plaintiff corporation seeks one amount of monetary relief, but bases its claim on three distinct causes of action. They sound respectively in breach of contract, gross negligence and violation of statutory duty.
Having commenced its corporate existence in 1948, plaintiff removed its base of operations from Amityville to Lindenhurst in the year 1954. It kept its old telephone number and applied for and was given an additional one at its new location. The new number, TU 8-3030, it retained unchanged until February, 1960, when the prefix 516 as an area code was added, coincident with direct distance dialing (DDD) in Suffolk County.
Plaintiff obtained 90% of its construction and renovation business via the medium of newspaper advertising which brought about telephone inquiries and eventual contracts. Its customers hailed from Nassau, Suffolk and Westchester Counties, and from all of the Boroughs of New York City, except Richmond.
Prior to and since the installation of DDD in Suffolk the defendant (hereafter ‘ the Company ’) literally flooded all communication media with information anent the necessity of using the area code when calling from a location beyond its boundaries. It placed the information as inserts in its subscribers’ bills — ■ it advertised in newspapers and magazines — it set forth instructions in its own directories — it employed the facilities of both *231 radio and television — it sent special brochures to its business subscribers — it even circularized printers to alert them to the necessity of having their customers include the area code on their stationery.
This mass broadcast was not confined to Suffolk. The same treatment was accorded to all the metropolitan areas, including those within the ambit of plaintiff’s customer range.
Despite the spate of literature devoted to area codes, telephone users in enormous numbers neglected to include the three digits in their calls. This neglect resulted in an interception and reminder by the Company, either by recording or by live voice or by a dial tone distinct from a ‘ ‘ don’t answer ’ ’ or a “ busy ” signal which alerted the caller to the necessity of their use.
The interception was a voluntary act on the part of the Company. It was not mandated by the Public Service Commission (hereafter PSC) nor did the Company in any manner assure its subscribers that it would contract to correct their bad calling habits. It was a matter of both courtesy and simple economics, for, as to the latter, the defendant was interested in seeing calls completed so that revenue would accrue.
From February, 1960 until May 22, 1962, plaintiff had no trouble with its telephonic reception and transmission. On the latter date an event occurred which became the proximate but not the immediate cause of the within action.
The number ‘ ‘ 212 AB 1-3030 ’ ’ was assigned to a subscriber in Queens County. Viewed merely as an equivalent of a three digit number on the dial, “AB-1” would result in “271”, not “ TU-8 ” or “ 888 ”. But, as explained by a witness for the company: ‘ ‘ The AB 1-3030 was a working line, working on the 888 exchange. So that when you dialed TU-8 without using the code from New York City, you would land in the 888 exchange, which 3030 was working as part of that exchange, but under an AB-1 central office designation. ’ ’
For about six months after May 22, no known trouble occurred affecting plaintiff’s telephone service. However, on January 9,1963, it received a call from the “ 212 AB 1-3030 ” subscriber that she had received a total of 30 calls between December 1, 1962 and that day which were intended for the plaintiff corporation. Since all of the New York City Boroughs have 212 as their area code it followed that all 30 calls meant for plaintiff must have had their origin from within the city limits. As luck would have it, plaintiff’s gross sales diminished abruptly for the month of December, 1962, as contrasted with the same month in the two preceding years. The average difference *232 amounted to about $13,000. Based on a percentage of profit for its jobs, plaintiff estimated it lost some $4,000 on this item alone; and it laid the blame for its loss squarely on the Company’s doorstep.
The nature of the proof as it unfolded indicated that as soon as the knowledge of the mixup of numbers was conveyed to the Company by plaintiff’s president and secretary no further trouble was experienced. At least no additional calls came from the Queens subscriber; and business appeared to resume its normal level for the plaintiff.
Testimony on plaintiff’s behalf further developed the fact that on the average one of every three telephone calls resulted in a contract for plaintiff’s services; that some $1,500 per month was spent for newspaper advertising and $75 for art work. Plaintiff contended that two thirds of these two figures was spent fruitlessly in the month of December, because of what occurred, and that it should be reimbursed overall to the extent of some $5,500.
Prom the foregoing factual recital it is plain that until May 22, 1962, when “ 212 AB. 1-3030 ” became a working number, every time a city dweller would dial ‘ ‘ TU 8-3030 ’ ’ he would get an interception plus an admonition to use an area code number or to correct his dialing. On May 22 with the appearance on the scene of the new Queens number, automation fell down on the job. It had no way of knowing — any more than a human would — that the caller had no desire to speak with the Queens subscriber, but wanted rather to discuss construction or renovation work with the plaintiff. It merely responded correctly to the dialer’s digital manipulation.
This was not a question of crossed wires — of getting a number out of all relation to the one dialed. The caller got exactly what he paid for and dialed for. How, then, was the Company to blame?
In effect, according to plaintiff’s reasoning, it was lulled into a false sense of security by defendant in that prior to May 22, 1962, and certainly prior to the December debacle, interception caused the distracted dialer to dial again.
Yet as far as the contract action goes there was no vested right to this service. Certainly, the tons of literature disseminated by the Company should have penetrated the brainpans of the body politic to the necessity of using the area codes. The fact that there came a time when the voluntary service was discontinued due to the happenstance of a similar but not identical number in Queens (the difference being in the area codes) gives rise to no cause of action in plaintiff. No mechan *233 ical breakdown of the Company contributed to the mishap. The fault lay directly in improper dialing by the prospective customers of the plaintiff, who were surely not agents of the defendant.
Further there is no way of knowing the nature of the 30 calls to ‘ ‘ AJEt 1-3030 ’ ’, nor whether the callers followed up by calling plaintiff; and if so, whether the calls were productive of contracts.
These matters are speculative and impossible of computation. (Hadley v. Baxendale, 9 Exch. 341; 5 Eng. Rul. Cas. 502; Kerr S.S. Co. v. Radio Corp. of America, 245 N. Y. 284.) It may be that the drop in plaintiff’s business was caused by other factors such as lay-offs or the fear of lay-offs in defense industries; or by factors in the business cycle, as to which no proof was presented to the court. In any event, the plaintiff has failed to sustain its burden of proof and hence the action for breach of contract is dismissed.
Gross, or culpable, negligence forms the gravamen of the second cause of action. This term has been defined as “ disregard of the consequences which may ensue from the act, and indifference to the rights of others ”. (People v. Angelo, 246 N. Y. 451, 457.)
No such situation obtains in this instance. There is no evidence even of ordinary negligence on the part of the Company, much less that of a gross variety. And even if there were such a degree of negligence, plaintiff would be out of court because of its own contributory negligence in failing to insert the area code 516 in its stationery, its billheads and its newspaper advertising after the establishment of DDD was brought home to it on so many occasions.
Hence the second cause of action is also dismissed.
With respect to the third cause of action plaintiff has particularly alleged that defendant has violated sections 91 and 93 of the Public Service Law. For our purposes section 91 states that: “ 1. Every * * * telephone corporation shall furnish and provide with respect to its business such instrumentalities and facilities as shall be adequate and in all respects just and reasonable ” and “ 3. No # * * telephone corporation shall * * * subject any particular person, corporation or locality to an undue or unreasonable prejudice or disadvantage in any respect whatsoever.”
Section 93 provides fitting penalties for a violation of section 91 or any other portion of the Public Service Law.
The principle enunciated in the case relied upon by plaintiff, Emery v. Rochester Tel. Corp. (156 Misc. 562, affd. 246 App. *234 Div. 787, revel, on other grounds 271 N. Y. 306) is inapposite in this instance. An affirmative defense of absolute exemption from liability was stricken by Special Term and affirmed by the Fourth Department on considerations of public policy.
But the rules and regulations of the company as promulgated and filed (with the PSC) are not absolute in their limitations. They embrace the theory of liability for gross or willful negligence, precisely as contended for by plaintiff in its first and second cause of action, which the court has dismissed for lack of proof.
Moreover, section 93 states that: “In case any * * * telephone corporation shall do or cause to be done or permit to be done any act, matter or thing prohibited, forbidden, or declared to be unlawful, or shall omit to do any act, matter or thing required to be done, either by law of the State of New York by this chapter or by any order of this commission, such * * * telephone corporation shall be liable to the person or corporation affected thereby for all loss, damage or injury caused thereby or resulting therefrom ’ ’.
As noted by Steuer, J., in Leighton v. New York Tel. Co. (187 Misc. 132, 134): “the enabling section (§93) giving the cause of action contemplates the disobedience of a positive command or injunction. It would be rather unusual to interpret a statute penal in its nature as calling for action so remote from its context. ’ ’
It follows that the third cause of action is dismissed.
One further item remains to be disposed of. At the conclusion of the entire case, plaintiff sought leave to amend its complaint by substituting or adding to it the theory of res ipsa loquitur. Its counsel argued that the Company had the duty of coming forward with an explanation both as to how and why the trouble occurred initially, and why it suddenly ceased upon the complaint being made to the Company after the Queens subscriber called.
The court now denies the motion (1) on the ground that an employee of the Company did explain the apparent (but not real) duplication of telephone numbers, and (2) because the Company had no control over the activities of persons not in its employ nor under its supervision who inadvertently misdialed the telephone instruments.
The complaint in its entirety is dismissed on motion of the defendant made at the end of the plaintiff’s case and renewed at the end of the entire case; and judgment is awarded to the defendant, with costs.